# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| KAREN MCDOUGAL, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-11161-MKV |
| | ) | |
| FOX NEWS NETWORK, LLC, | ) | **ORAL ARGUMENT REQUESTED** |
| | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF
## DEFENDANT'S MOTION TO DISMISS

ERIN E. MURPHY*
K. WINN ALLEN, P.C.*
KATHLEEN A. BROGAN*
ANDREW C. LAWRENCE*
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington, DC 20004
(202) 389-5000

EVELYN BLACKLOCK*
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 390-4547

SHAWN PATRICK REGAN
HUNTON ANDREWS KURTH LLP
200 Park Avenue
New York, NY 10166
(212) 309-1046
sregan@hunton.com

ELBERT LIN*
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Ave., NW Suite 900
Washington, DC  20037
(202) 955-1548

* pro hac vice

*Counsel for Defendant Fox News Network, LLC*

February 14, 2020

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

      A.      The *Tucker Carlson Tonight* Segment ................................................... 2

      B.      This Lawsuit ................................................................................................. 6

ARGUMENT ........................................................................................................................ 7

I.      The Amended Complaint Fails To State A Claim For Slander *Per Se* ............................. 8

      A.      The Amended Complaint Challenges Statements That Cannot Reasonably Be Interpreted as Reporting Facts ....................................... 8

      B.      The Amended Complaint Fails to Allege Actual Malice ..................... 17

CONCLUSION ................................................................................................................... 23

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*600 W. 115th St. Corp. v. Von Gutfeld*,
    80 N.Y.2d 130 (1992) ........................................................................................ 15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .......................................................................................... 7

*Automated Transactions, LLC v. Am. Bankers Ass'n*,
    216 A.3d 71 (N.H. 2019) .................................................................................. 11

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .......................................................................................... 7

*Biospherics, Inc. v. Forbes, Inc.*,
    151 F.3d 180 (4th Cir. 1998) ........................................................................... 13

*Biro v. Conde Nast*,
    807 F.3d 541 (2d Cir. 2015) ....................................................................... 17, 19

*Biro v. Conde Nast*,
    963 F. Supp. 2d 255 (S.D.N.Y. 2013) .......................................................... 7, 18

*Brodkorb v. Minnesota*,
    No. CIV. 12-1958 SRN/AJB, 2013 WL 588231 (D. Minn. Feb. 13, 2013) ........... 10

*Celle v. Filipino Reporter Enters. Inc.*,
    209 F.3d 163 (2d Cir. 2000) ........................................................................... 17

*Clifford v. Trump*,
    339 F. Supp. 3d 915 (C.D. Cal. 2018) ....................................................... 12, 14

*Curtis Publ'g Co. v. Butts*,
    388 U.S. 130 (1967) ........................................................................................ 17

*Flamm v. Am. Ass'n of Univ. Women*,
    201 F.3d 144 (2d Cir. 2000) ............................................................................. 9

*Friedman v. Bloomberg L.P.*,
    884 F.3d 83 (2d Cir. 2017) ............................................................................. 16

*Garrison v. Louisiana*,
    379 U.S. 64 (1964) .......................................................................................... 20

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974) ..................................................................................... 8, 17

*Greenbelt Coop. Publ'g Ass'n, Inc. v. Bresler*,
    398 U.S. 6 (1970) ................................................................................................ 9, 10, 15

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989) ................................................................................................ 19, 22

*Hobbs v. Imus*,
    698 N.Y.S.2d 25 (N.Y. App. Div. 1999) ................................................................ 11

*Hogan v. Winder*,
    762 F.3d 1096 (10th Cir. 2014) ...................................................................... 10, 12, 13

*Horsley v. Rivera*,
    292 F.3d 695 (11th Cir. 2002) ............................................................................ 11, 13

*Hu v. City of New York*,
    927 F.3d 81 (2d Cir. 2019) ................................................................................ 3

*Lerman v. Flynt Distrib. Co.*,
    745 F.2d 123 (2d Cir. 1984) .............................................................................. 17

*Levinsky's, Inc. v. Wal-Mart Stores, Inc.*,
    127 F.3d 122 (1st Cir. 1997) ............................................................................ 14

*Masson v. New Yorker Magazine, Inc.*,
    501 U.S. 496 (1991) ............................................................................................ 16, 19, 21

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990) .......................................................................................... *passim*

*Mr. Chow of N.Y. v. Ste. Jour Azur S.A.*,
    759 F.2d 219 (2d Cir. 1985) .............................................................................. 8

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ................................................................................ 8, 9, 17, 21

*Nielsen v. Rabin*,
    746 F.3d 58 (2d Cir. 2014) .............................................................................. 7

*Palin v. N.Y. Times Co.*,
    940 F.3d 804 (2nd Cir. 2019) .......................................................................... 21, 22

*Phila. Newspapers, Inc. v. Hepps*,
    475 U.S. 767 (1986) ........................................................................................ 8

*Remick v. Manfredy*,
    238 F.3d 248 (3d Cir. 2001) ............................................................................ 10

*Rothstein v. UBS AG,*
    708 F.3d 82 (2d Cir. 2013) ................................................................................ 7

*Small Bus. Bodyguard Inc. v. House of Moxie, Inc.,*
    230 F. Supp. 3d 290 (S.D.N.Y. 2017) .............................................................. 10

*St. Amant v. Thompson,*
    390 U.S. 727 (1968)..................................................................................... 19, 20

*Wainwright v. Tyler,*
    253 So. 3d 203 (La. Ct. App. 2018) .................................................................. 11

*Wheeler v. Twenty-First Century Fox,*
    322 F. Supp. 3d 445 (S.D.N.Y. 2018) ............................................................... 8

**Other Authorities**

The American Heritage Dictionary of the English Language (5th ed. 2011) ............................. 12

*Black's Law Dictionary* (11th ed. 2019)................................................................. 13

Fox News, *Tucker Carlson Tonight,* https://fxn.ws/2QUphw9 (last visited Feb. 14,
    2020) ................................................................................................................... 3

Fox News, *Tucker Carlson,* https://fxn.ws/35CHHXs (last visited Feb. 14, 2020)................. 3, 13

Karen McDougal, *Model, Columnist, Advocate, Spokesmodel,*
    karenmcdougal.com/about (last visited Feb. 14, 2020) ........................................ 18

Sharon LaFraniere et al., *Prosecutors Say Trump Directed Illegal Payments
    During Campaign,* N.Y. Times (Dec. 7, 2018), https://nyti.ms/2RflDNm .................... 4

Joe Palazzolo et al., *National Enquirer Shielded Donald Trump From Playboy
    Model's Affair Allegation,* Wall St. J. (Nov. 4, 2016),
    https://on.wsj.com/2TolUjN ................................................................................. 18

Jim Rutenburg, *Ex-Playboy Model Karen McDougal Details 10-Month Affair
    With Donald Trump,* N.Y. Times (Mar. 22, 2018), https://nyti.ms/2T7SBBO....................... 18

1 Rodney A. Smolla, *Law of Defamation* (2d ed. 2010)................................................ 9

## INTRODUCTION

This case is an attempt to silence spirited opinion commentary on matters of public concern.  Roughly a year ago, the news was dominated by stories claiming that President Donald Trump had committed impeachment-worthy crimes by directing hush money to two women who claimed to have had affairs with him.  Plaintiff Karen McDougal, a prominent model, was one of those women.  After the *New York Times* sought to explain why the payments were illegal campaign contributions, host Tucker Carlson took critical aim at that theory during an episode of *Tucker Carlson Tonight*, a television talk show aired by defendant Fox News Network, LLC (Fox News).  In one of the show's several segments, Carlson accepted as true the facts as reported by others and posited that the two women (whom he did not name) had "extorted" money and obtained "ransom" payments from Trump.  Plaintiff brought this suit claiming that defendant Fox News defamed her by publishing Carlson's comments.  For two independent reasons, plaintiff's suit offends basic First Amendment principles and must be dismissed.

*First*, Carlson's statements are covered by the First Amendment privilege that protects statements of opinion relating to matters of public concern that do not contain provably false factual assertions.  Plaintiff's suit turns on an attempt to characterize Carlson's hyperbolic opinion commentary as sober factual reporting.  That effort is unsuccessful.  The four corners of the amended complaint—which incorporate by reference the full *Tucker Carlson Tonight* episode— show that the challenged statements are the kind of loose, figurative, and hyperbolic commentary that is entitled to First Amendment protection.  Moreover, the statements are plainly offered as opinion on a set of facts reported elsewhere, not as actual statements of fact.  In that context, no reasonable viewer would conclude that Carlson was conveying that plaintiff had literally engaged in the criminal act of extortion or literally held anyone or anything hostage for a ransom payment.

1

*Second*, the amended complaint fails to allege that Carlson's statements were made with actual malice. Under well-established Supreme Court precedent, public figures must plead facts that, if true, would plausibly show that a defendant's statements were made with actual malice— that is, with knowledge that the statements were false or with reckless disregard as to their falsity. Because plaintiff is a public figure, she is subject to that heightened burden. But her amended complaint comes nowhere close to meeting it. The amended complaint's first theory of actual malice—that Carlson failed to investigate the facts before commenting on the payment to plaintiff—amounts to an accusation of mere negligence, which is not sufficient under Supreme Court precedent. And its second theory—that Carlson must have known his statements were false because Fox News had previously reported on the payment without mentioning extortion—also runs up against Supreme Court precedent rejecting a virtually identical argument. Plaintiff's vague, atmospheric assertions alongside those two theories—that Carlson and Trump enjoyed a "close personal relationship" and that Carlson was biased in favor of Trump and against plaintiff— do not establish actual malice. Plaintiff's suit therefore must be dismissed.

**BACKGROUND**[1]

**A.    The *Tucker Carlson Tonight* Segment**

Fox News produces a television talk show called *Tucker Carlson Tonight*. The show is hosted by Tucker Carlson, a well-known conservative commentator, and airs weekday evenings on the Fox News Channel. Am. Compl. ¶¶4-5. On its website, the show bills itself as "the sworn enemy of lying, pomposity, smugness and group think."[2] Fox News, *Tucker Carlson Tonight*,

---

[1]    The allegations in the amended complaint are presumed true for the purposes of this motion to dismiss.

[2]    The amended complaint references the website. *See* Am. Compl. ¶6. This Court therefore may consider the language on the show's website, as well as other materials referenced in the

2

https://fxn.ws/2QUphw9 (last visited Feb. 14, 2020).  The "About Tucker" section of the website further states that the show features "powerful analysis and spirited debates," with Carlson "[b]ringing his signature style" to "challenge[] political correctness and media bias with segments like 'Campus Craziness' and 'TwitterStorm.'"    Fox News, *Tucker Carlson*, https://fxn.ws/35CHHXs (last visited Feb. 14, 2020).

On December 10, 2018, *Tucker Carlson Tonight* aired an hour-long episode that featured multiple segments, including "Flawed 'Russia' Probe," "Tech Tyranny," and a "Free Speech Debate" concerning years-old tweets by actor Kevin Hart.[3]  Vid. 0:05, 17:55, 27:14.  In "Flawed 'Russia' Probe," Carlson offered skeptical commentary on a series of recent cable television and newspaper pieces opining that President Trump had committed crimes worthy of impeachment. *See, e.g.*, Vid. 1:06 (MSNBC clip of Congresswoman Maxine Waters stating of the President: "This criminal must be brought up by the Congress of the United States for impeachment").  After showing viewers several clips of remarks by what he sarcastically termed "legal experts without law degrees," Vid. 0:30, Carlson turned to an article published in the *New York Times* a few days earlier, Vid. 1:33.  That article—titled "Prosecutors Say Trump Directed Illegal Payments During Campaign"—became the focus of the remainder of the segment.[4]

The "gist" of the article, Carlson explained, was that President Trump's former lawyer, Michael Cohen, had told federal prosecutors that Cohen had facilitated payments to two women

---

amended complaint and matters of which judicial notice may be taken.  *See, e.g.*, *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019).

[3] Defendant is providing the Court with a recording of the show along with courtesy copies of the briefing.  A transcript is available at https://fxn.ws/36BY7Rb.

[4] *See* Sharon LaFraniere et al., *Prosecutors Say Trump Directed Illegal Payments During Campaign*, N.Y. Times (Dec. 7, 2018), https://nyti.ms/2RflDNm.

who claimed they had had affairs with Trump.  Vid. 1:46.  The *New York Times* described the

payments as "illegal" and maintained that they constituted "direct evidence ... linking Mr. Trump

to potentially criminal conduct."  LaFraniere et al., *supra* n.4.  Carlson observed that his viewers

might be wondering how the activity described in the article could be considered "criminal" and

offered to explain the prosecutors' theory.  Vid. 2:11, 2:14.

Carlson began by stipulating, for the sake of argument, that everything Cohen had told

federal prosecutors was true—even though "assuming honesty isn't usually a wise idea with

Michael Cohen."  Vid. 2:21.  He then asked viewers to "[r]emember the facts of the story" about

which the *New York Times* had written, accepting them as "undisputed."  Vid. 2:34.  He continued:

> Two women approach Donald Trump and threaten to ruin his career and humiliate
> his family if he doesn't give them money.  Now that sounds like a classic case of
> extortion.  Yet for whatever reason, Trump caves to it, and he directs Michael Cohen
> to pay the ransom.  Now, more than two years later, Trump is a felon for doing this.
> It doesn't seem to make any sense.
>
> Oh, but you're not a federal prosecutor on a political mission.  If you were a federal
> prosecutor on a political mission, you would construe those extortion payments as
> campaign contributions.  You'd do this even though the money in question did not
> come from, or go to, Donald Trump's presidential campaign.  Then you'd claim
> that Trump and Michael Cohen violated campaign finance law because they didn't
> publicly disclose those payments. …  That is the argument you would make, both
> in federal court and through your proxies on cable television.

Vid. 2:36-3:37.  Carlson deemed that argument "insultingly stupid," Vid 3:37, and went on to

criticize its logic and comment on its implications for the "taxpayer-financed slush fund that

Congress has set aside to pay off its own sexual harassment claims," Vid. 4:07.

Carlson then interviewed two guests, beginning with radio host Chris Hahn, a former aide

to Democratic Senator Charles Schumer whom Carlson described as not "lik[ing] Trump."  Vid.

5:46.  Hahn was also identified on-screen as a "Progressive Radio Host."  Vid. 6:03.  Carlson asked

Hahn to explain "why paying off someone who is extorting you, threatening to make public details

of your personal life, if she doesn't get paid, why paying that person is a felony." Vid. 5:51. Hahn

responded: "[F]irst of all, we don't know that there was actual extortion here. We know that a

payment was made. There was a catch and kill deal with the *National Enquirer*. Whether or not

it was extortion, that hasn't been proven yet." Vid. 6:02. (At that point in the interview,

photographs of two women appeared on the screen without any identifying information. Neither

woman was named during the segment.) Carlson interrupted Hahn, insisting:

> You're not going to pay a hundred grand or a hundred and fifty or two hundred
> grand to someone unless there's a threat to you and your reputation. This is
> extortion. Now, I don't know why it's not being prosecuted, I don't know why
> Trump isn't defending himself on those grounds. I would. But it clearly is
> extortion.

Vid. 6:20.

When Hahn observed that Trump might have simply offered to pay the women after

learning they were planning to go public with their stories, Carlson cut in again: "That's extortion.

If I did that to you, you would call it, if I said, 'look, I know a detail about your sex life, Chris

Hahn, and I'm going to tell it on my show on TV unless you pay me,' that would be extortion."

Vid. 6:46. The rest of the interview focused on the *New York Times* article and the theory that the

payments to the two women qualified as illegal campaign contributions. Carlson continued to

insist that "pay[ing] off your girlfriend" should not be considered a campaign contribution, and he

criticized what he saw as a pattern of politically motivated prosecutions of "populist[s]" using

"B.S. campaign finance nonsense." Vid. 10:36, 12:00.

Carlson next interviewed retired law professor Alan Dershowitz. Dershowitz remarked at

length on what he considered to be the hypocrisy of commentators who insisted that Trump had

violated campaign finance law. Carlson then asked: "Is it unfair to describe this scenario as

extortion? I say, 'I know something about your sex life … [a]nd unless you pay me money, I'm

going to reveal it.'  That seems like textbook extortion to me, why is it not?"  Vid. 15:28-15:44.

Dershowitz replied:  "It is absolutely textbook extortion."  Vid. 15:45.  The interview, and segment,

closed with Dershowitz explaining why he thought the payments to the two women could not have

violated campaign finance law.

Carlson then turned to the remaining topics on the show.  In the "Tech Tyranny" segment,

Carlson stated (among other things) that "Google" had grown "more powerful than the U.S.

government" and had "subvert[ed] our democracy entirely."  Vid. 22:16.  He also likened

children's use of smartphones to "two-year-olds … huffing on Marlboros."  Vid. 25:06.  In the

segment discussing Kevin Hart, Carlson declared that "Hollywood ha[d] issued a new decree" that

"Kevin Hart's career must be destroyed," and that "everyone obeyed immediately."  Vid. 27:14.

He further lamented that "[a]ll of us at some point are going to be accused of thoughtcrime, and

the mob will come for us.  It's inevitable."  Vid. 29:33.

### B.      This Lawsuit

Nearly a year later, plaintiff sued Fox News, asserting a single count of slander *per se*.  *See*

Dkt. No. 1-1 ¶¶49-56.  On January 13, 2020, Fox News moved to dismiss the complaint under

Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim.  *See* Dkt. Nos.

17-18.  On January 28, 2020, Plaintiff filed an amended complaint, which also asserts a single

count of slander *per se*.  *See* Am. Compl. ¶¶52-59.

The amended complaint alleges that the *Tucker Carlson Tonight* segment published false

and defamatory statements about plaintiff.  In particular, the amended complaint states that *Tucker*

*Carlson Tonight* slandered plaintiff by falsely accusing her of committing the crime of extortion

against then-candidate Trump.  *Id.* ¶¶17, 38.  According to the amended complaint, plaintiff did

not approach Trump and threaten to ruin his career or humiliate his family if he did not pay her.

*Id.* ¶15.  Rather, the amended complaint asserts that, after plaintiff attempted to sell her story about

an affair with Trump to the *National Enquirer*, the editor of that magazine contacted Michael Cohen, who arranged for the magazine to buy the story and prevent its publication. *Id.* ¶¶24-25. Cohen later told prosecutors that he made the payment at Trump's direction. *Id.* ¶29. The amended complaint asserts that Carlson and Fox News easily could have discovered that plaintiff did not extort Trump. *Id.* ¶¶41, 43. It also alleges that Fox News (but not Carlson himself) had previously reported on the payment to plaintiff without mentioning extortion. *Id.* ¶¶36, 41, 47, 51.

## ARGUMENT

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter … to state a claim to relief that is plausible on its face." *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). "In addressing the sufficiency of a complaint," the Court must "accept as true all factual allegations and draw from them all reasonable inferences," but it is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)). These pleading standards have "particular value" in the context of defamation suits, "as forcing defamation defendants to incur unnecessary costs can 'chill the exercise of constitutionally protected freedoms.'" *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 279 (S.D.N.Y. 2013). Rule 12(b)(6) thus "protects against the costs of meritless [defamation] litigation" and "provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive." *Id.*

This Court should dismiss plaintiff's amended complaint, as it plainly fails to state a claim for defamation. The First Amendment protects purportedly defamatory statements that "cannot 'reasonably [be] interpreted as stating actual facts' about an individual." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990). It also bars a public figure from recovering damages for defamation unless she can show that the defendant made the challenged statement with "actual

malice"—*i.e.*, "with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974).  The amended complaint here fails under a straightforward application of these principles, as it does not challenge any statements of actual fact, let alone plausibly allege that any such statement was made with actual malice.[5]  The Court should therefore dismiss this case and maintain the "breathing space" that "freedoms of expression" require "to survive." *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 787-88 (1986).

I.     **The Amended Complaint Fails To State A Claim For Slander *Per Se*.**

   A.     **The Amended Complaint Challenges Statements That Cannot Reasonably Be Interpreted as Reporting Facts.**

The amended complaint alleges that defendant is liable for defamation—namely, slander *per se*.  *See* Am. Compl. ¶¶38, 57.  For that defamation claim to advance beyond the motion-to-dismiss stage, plaintiff must demonstrate that defendant made a statement that can "'reasonably [be] interpreted as stating actual facts'" concerning plaintiff that are false and defamatory. *Milkovich*, 497 U.S. at 20; *see also, e.g.*, *Wheeler v. Twenty-First Century Fox*, 322 F. Supp. 3d 445, 453 (S.D.N.Y. 2018) ("'[s]tatements that cannot be reasonably interpreted as stating actual facts' cannot form the basis of a defamation claim").  That is a legal question for the court to decide.  *See, e.g.*, *Mr. Chow of N.Y. v. Ste. Jour Azur S.A.*, 759 F.2d 219, 224 (2d Cir. 1985) ("the determination of whether a statement is opinion or rhetorical hyperbole as opposed to a factual representation is a question of law for the court").  In answering it, the "critical issue" is "whether

---

[5] Defamation is a state-law cause of action, and plaintiff's amended complaint—like the original complaint—does not identify which state law she thinks governs.  Because this Court can resolve this case solely by reference to First Amendment principles and federal pleading standards articulated by the Supreme Court, however, this Court need not conduct a choice-of-law analysis at this time.

the hypothetical reasonable" viewer would consider the challenged statements defamatory; it is "not whether some actual" viewers did so.[6]  1 Rodney A. Smolla, *Law of Defamation* §4.17 (2d ed. 2010); *id.* ("The appropriate inquiry is objective, not subjective."); *see also Milkovich*, 497 U.S. at 21.  Plaintiff cannot satisfy that burden because she takes issue with statements that are squarely protected by the First Amendment.

The First Amendment protections that apply in defamation suits are grounded in the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times,* 376 U.S. at 270.  To preserve that commitment, the Supreme Court has stated that "loose, figurative, or hyperbolic language" simply cannot give rise to a defamation claim, for such language "negate[s] the impression" that a person is "seriously" stating a fact. *Milkovich*, 497 U.S. at 20-21.  The Court also has instructed that "the general tenor" or larger context in which a purportedly defamatory statement appears may negate the impression that the statement is factual.  *Id.* at 21.  Vigorous protection for "imaginative expression," "rhetorical hyperbole," and similar categories of speech is vitally important because such speech has "traditionally added much to the discourse of our Nation."  *Id.* at 20; *see Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 148 (2d Cir. 2000).

The Supreme Court's decision in *Greenbelt Cooperative Publishing Association, Inc. v. Bresler*, 398 U.S. 6 (1970), is illustrative.  There, the Court considered newspaper articles that had reported on zoning negotiations between a city and a public figure (a prominent local real estate developer and builder who also served as a state legislator).  *Id.* at 7.  At "several tumultuous city council meetings," members of the community had commented on those negotiations, and "some

---

[6] Accordingly, it is irrelevant how Carlson's actual "viewership" or "audience"—whether composed of "3,400,000 viewers" (Am. Compl. ¶4), "2.8 million viewers," (*id.* ¶12), or any other number—may have interpreted his commentary.

people had characterized [the public figure's] negotiating position as 'blackmail.'"  *Id.*  After the newspaper printed the blackmail-related statements in two articles, the public figure sued for defamation, alleging that the newspaper had falsely "imputed to him the crime of blackmail."  *Id.* at 8.  The lower courts sustained that claim, but the Supreme Court reversed.  The Court concluded that, "as a matter of constitutional law, the word 'blackmail' in these circumstances was not slander when spoken, and not libel when reported," as that word "was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the public figure's] negotiating position extremely unreasonable."  *Id.* at 13-14.  "To permit the infliction of financial liability … for publishing these two news articles," the Court continued, "would subvert the most fundamental meaning of a free press."  *Id.* at 14.

The same reasoning has doomed defamation suits involving accusations of "extortion." Like accusations of blackmail, "accusations of extortion are a familiar rhetorical device."  *Hogan v. Winder*, 762 F.3d 1096, 1108 (10th Cir. 2014).  As a result, courts—including courts in this district—have consistently rejected defamation claims premised on such charges.  *See, e.g.*, *id.* ("no reasonable reader would interpret the articles' statement that Hogan was accused of extortion to mean that Hogan was being accused of a crime"); *Small Bus. Bodyguard Inc. v. House of Moxie, Inc.*, 230 F. Supp. 3d 290, 312 (S.D.N.Y. 2017) ("even if [the] statement could be viewed as a direct allegation that Rodgers engaged in 'extortion, manipulation, fraud, and deceit,' this vague statement is of the 'loose, figurative, or hyperbolic' sort that is not actionable for defamation"); *Remick v. Manfredy*, 238 F.3d 248, 262 (3d Cir. 2001) ("In this instance, the use of the term 'extort' is non-defamatory 'rhetorical hyperbole, a vigorous epithet used by those who considered [plaintiff's] negotiating position extremely unreasonable.'"); *Brodkorb v. Minnesota*, No. CIV. 12-1958 SRN/AJB, 2013 WL 588231, at *12 (D. Minn. Feb. 13, 2013) ("'extort' and 'blackmail'

were used in a generalized sense, and not as a label for punishable criminal offenses"); *see also, e.g.*, *Automated Transactions, LLC v. Am. Bankers Ass'n*, 216 A.3d 71, 87 (N.H. 2019) ("no reasonable listener would understand the reference to extortion to amount to an accusation that ATL had committed a literal crime"); *Wainwright v. Tyler*, 253 So. 3d 203, 220-21 (La. Ct. App. 2018) ("The use of the words 'blackmail,' 'extorted,' and 'shakedown' were the expression of opinions by Tyler and Crawford regarding the events initiated by the plaintiffs and were based upon the facts reported in the media.  Contrary to the plaintiffs' arguments, these statements were fair comment on the demands of the plaintiffs and were similar to the rhetorical hyperbole regarding a negotiating position discussed in *Greenbelt*.").

Courts also have recognized that spirited debate on talk-show programs does not lend itself well to statements of actual fact, as over-the-top and emotionally charged language is commonplace in that setting.  *See, e.g.*, *Horsley v. Rivera*, 292 F.3d 695, 697, 702 (11th Cir. 2002) (concluding that Geraldo Rivera's on-air statement that the plaintiff was an "accomplice to murder" was "absolutely protected as rhetorical hyperbole" in light of the "context surrounding the statement," which "consisted of the sort of loose, figurative language that no reasonable person would believe presented facts"); *Hobbs v. Imus*, 698 N.Y.S.2d 25, 26 (N.Y. App. Div. 1999) (affirming dismissal of defamation suit against Don Imus because, "[w]hen considered in the context of the ribald radio 'shock talk' show in which they were made, it is clear that the complained of statements would not have been taken by reasonable listeners as factual pronouncements but simply as instances in which the defendant radio hosts had expressed their views over the air in the crude and hyperbolic manner that has, over the years, become their verbal stock in trade.").  That is especially true for statements uttered in the context of politically charged disputes:  It is now well-recognized that "rhetorical hyperbole" is "normally associated with

politics and public discourse in the United States." *Clifford v. Trump*, 339 F. Supp. 3d 915, 925 (C.D. Cal. 2018) (emphasis added); *id.* at 925-28 (dismissing defamation complaint filed by Stormy Daniels against President Trump).

Applying these principles, this is an easy case. The basic allegation in the amended complaint is that, on *Tucker Carlson Tonight*, Carlson "repeatedly accused [plaintiff] of committing the crime of extortion against Trump." Am. Compl. ¶17; *see also id.* ¶11 ("Carlson stated that [plaintiff] extorted Trump and that was why Trump caused the payment of $150,000 to be made to [plaintiff]"); *see also id.* ¶13 (stating that "Carlson put a picture of [plaintiff] on the screen while reporting that she extorted Trump"). Thus, in plaintiff's view, "a reasonable viewer of ordinary intelligence listening or watching the Show … would conclude that [plaintiff] is a criminal who extorted Trump for money." *Id.* ¶39; *see also id.* ¶37 ("After listening or watching the Show, a reasonable viewer would have concluded that the statements about [plaintiff] were fact and that she is a criminal that engaged in illegal activity against the would-be President of the United States."). In fact, context makes plain that the reasonable viewer would do no such thing.

Start with the challenged language itself. As an initial matter, the term "extortion" does not have a single, universally shared meaning. *See, e.g.*, Extortion, The American Heritage Dictionary of the English Language 628 (5th ed. 2011) (providing three definitions). To the contrary, as the Tenth Circuit has explained, "[w]e all know of colloquial or hyperbolic uses of the term" that bear no relationship to the criminal definition. *Hogan*, 762 F.3d at 1108. Consequently, a court may not merely "assume that the term always refers to a crime or similarly heinous conduct," but must instead examine its use in the particular circumstances of a given case. *Id.* That inquiry demonstrates that Carlson's invocation of the term "extortion" falls comfortably on the constitutionally protected side of the line.

12

Throughout the "Flawed 'Russia' Probe" segment, Carlson was using the term "extortion" in a colloquial and hyperbolic manner.  In the initial part of the segment, for example, he refers to the "extortion" payments as "ransom" money in the same breath.  Am. Compl. ¶10.  No reasonable viewer could understand Carlson to be saying that plaintiff illegally obtained money after "captur[ing] a person or property" and holding it hostage.  *See* Ransom, *Black's Law Dictionary* (11th ed. 2019).  Indeed, not even plaintiff makes that fanciful claim, which goes to show that she herself recognizes that Carlson's "dialogue was taking place on an animated, non-literal plane." *Horsley*, 292 F.3d at 702.  There is no logical basis for a different conclusion when it comes to "extortion":  A reasonable viewer would not have understood Carlson to be saying that plaintiff literally confronted Trump and sought to engage in a criminal act, as opposed to "extorting" money in the "colloquial" sense that "[w]e all know."  *Hogan*, 762 F.3d at 1108.

Carlson himself indicated during the show that he meant "extortion" in a loose sense—*i.e.*, requiring nothing more than a payment to a person to ensure that intimate details of one's private life remain secret.  *See, e.g.*, Vid. 6:20 ("You're not going to pay a hundred grand or a hundred and fifty or two hundred grand to someone unless there's a threat to you and your reputation.  This is extortion."); Vid. 6:44 (Carlson stating "that's extortion" in response to Chris Hahn's statement that "sometimes people … want to tell a story that he doesn't want told").  Such "imprecise, casual language" cannot support a defamation claim.  *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 186 (4th Cir. 1998).

The "general tenor" of the segment—in fact, of the entire show—reinforces the conclusion that Carlson was not "stating actual facts" about extortion in the legal sense.[7]  *Milkovich*, 497 U.S.

---

[7] Carlson is not a lawyer and does not have a law degree.  *See, e.g.*, Fox News, *Tucker Carlson*, https://fxn.ws/35CHHXs (last visited Feb. 14, 2020) ("Carlson graduated with a B.A. in history from Trinity College.").

at 20-21.  To begin with, the entire "Flawed 'Russia' Probe" segment is a 15-minute diatribe about what Carlson views as "insultingly stupid" and "B.S. campaign finance nonsense."  Vid. 2:58, 3:37, 12:00.  And the bulk of the discussion about "extortion" arises in the context of a heated back-and-forth exchange between Carlson and a "Progressive Radio Host" who does not "like Trump."  *See* Vid. 2:58-3:48, 5:46-12:19.  That is not a natural setting in which a reasonable viewer would conclude that he is hearing actual facts about plaintiff.  *See, e.g., Horsley*, 292 F.3d at 702 ("The fact that the parties were engaged in an emotional debate on a highly sensitive topic weighs in favor of the conclusion that a reasonable viewer would infer that Rivera's statement was more an expression of outrage than an accusation of fact."); *Clifford*, 339 F. Supp. 3d at 926 ("Mr. Trump's tweet displays an incredulous tone, suggesting that the content of his tweet was not meant to be understood as a literal statement about Plaintiff.").

That is especially true considering that, in the same episode, Carlson repeatedly used language that no one would interpret literally—*e.g.*, that "Congress" had "allow[ed] Google to become more powerful than the U.S. government, subverting our democracy entirely"; that "two-year-olds" are practically "huffing on Marlboros" when using smartphones; and that "Hollywood" had "issued a new decree" that "everyone obeyed immediately" to "destroy[]" Kevin Hart's career. *See* Vid. 22:16, 25:06, 27:14.  "[E]xaggeration and non-literal commentary" of this sort "have become an integral part of social discourse," and the First Amendment "shield[s]" that commentary from defamation claims. *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 128 (1st Cir. 1997).

None of this language is surprising in the broader context.  *Tucker Carlson Tonight* aims to ignite "spirited debates" in which Carlson deploys his "signature style."  *See* p.3, *supra*. Accordingly, "reasonable listeners" and viewers of the show should "arrive with an appropriate

amount of skepticism" and "come with the expectation that they are, in all probability, going to

hear opinion," and that "robust, controversial debate is expected and frequently encouraged." *600

W. 115th St. Corp. v. Von Gutfeld*, 80 N.Y.2d 130, 141 (1992). Just as a reasonable person at a

passionate public hearing would not conclude that a developer had actually committed the crime

of blackmail, *see Greenbelt*, 398 U.S. at 13-14, a reasonable person watching a talk-show program

whose mission is to "challenge[] political correctness and media bias" would not conclude that

plaintiff had actually committed the crime of extortion based on the statements at issue here, *see*

p.3, *supra*. Because plaintiff's amended complaint hinges on just such an implausible theory, it

fails at the threshold.

Indeed, even assuming *arguendo* that Carlson used the term "extortion" in a legal sense,

there is no basis to conclude that he was making actionable defamatory statements about plaintiff,

as Carlson was plainly offering opinion, not provable fact. While not every statement couched as

an opinion necessarily qualifies for First Amendment protection, "a statement on matters of public

concern must be provable as false before there can be liability." *Milkovich*, 497 U.S. at 19.

Colloquial or not, the statements at issue here do not satisfy that test. The discussion at the start

of the segment makes clear that Carlson is about to offer an opinion on a set of *assumed* facts, the

"gist" of which is derived from a *New York Times* article. Am. Compl. ¶10; Vid. 1:45. He does

not purport to have any knowledge of those "undisputed facts"[8] beyond what has been reported by

---

[8] The amended complaint repeatedly emphasizes that Carlson used the phrase "undisputed facts." *See* Am. Compl. ¶¶8, 9, 10, 11, 12, 16, 20, 34, 39, 47. Carlson used that phrase only once, right before he briefly recapped the facts as reported by the *New York Times* and others. *See* Vid. 2:34. And as the amended complaint acknowledges, the short recap that followed included the statement that "Trump is a felon" for directing payment of "the ransom." *Id.* ¶10. There was, of course, no literal "ransom," and, as the complaint acknowledges, Trump had not in fact been charged with or convicted of any crime in relation to these events, *see id.* ¶49 (noting that, the day before Carlson's show, "Sunday political television programs" had merely "discussed the possibility that Trump could be impeached and/or indicted because the payment to [plaintiff] was

other sources,[9] and he describes them only in loose and general terms.  Indeed, he never identifies plaintiff or the other woman by name, never distinguishes between either, and never specifies that one or both may have been acting through a lawyer.

Instead, throughout the entire segment, Carlson takes as a given what he identifies as having been reported elsewhere—namely, "[t]wo women approached Donald Trump and threatened to ruin his career and humiliate his family if he doesn't give them money," Vid. 2:36—offers his opinion, and solicits the opinion of his guests, on whether that scenario sounds like extortion.  In context, a reasonable viewer would have understood that Carlson was stating an opinion about what would follow from an assumed pattern of facts reported by other sources, not stating actual defamatory facts about plaintiff herself.  Given that context, Carlson's statements not only could not "reasonably be interpreted as stating actual facts about" plaintiff, but are not "provable as false."  *Milkovich*, 497 U.S. at 19-20.  For both reasons, the amended complaint fails as a matter of law.[10]

---

a violation of the federal election laws").  That underscores that a reasonable viewer would not have interpreted Carlson's characterization of those "undisputed facts" literally—particularly since it came on the immediate heels of his caveat that he was accepting the facts as reported by others only for the sake of argument.  *See* Vid. 2:21.

[9] That readily distinguishes this case from one in which a defendant suggests that he knows undisclosed, non-public facts that support his allegedly defamatory statement.  *Cf. Friedman v. Bloomberg L.P.*, 884 F.3d 83, 94-98 (2d Cir. 2017).

[10] Defamation claims also cannot survive if the challenged statements are "substantially true."  *See, e.g.*, *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516 (1991).  While it is unnecessary to resolve that issue given the fatal flaws in plaintiff's amended complaint, should the need arise, Fox News reserves the right to argue that Carlson's statements were indeed substantially true.

## B. The Amended Complaint Fails to Allege Actual Malice.

Even assuming, for the sake of argument, that plaintiff alleges any statements that *could* be actionable, this Court should dismiss the amended complaint for the independent reason that she fails to allege facts that, if true, would suffice to show any statement made with actual malice.

To encourage vigorous and open debate on matters of public concern, the First Amendment provides heightened protection for statements made about public officials and public figures. *See N.Y. Times*, 376 U.S. at 279-80; *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 154-55 (1967). To prevail on a defamation claim, such figures must show that the defendant made the allegedly defamatory statements with actual malice—"that is, with knowledge that the statements were false or with reckless disregard as to their falsity." *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015).

Public figures are those who "have assumed roles of especial prominence in the affairs of society." *Gertz*, 418 U.S. at 345. They come in two varieties: all-purpose and limited-purpose. All-purpose public figures have achieved such "general fame or notoriety in the community" and "pervasive involvement in the affairs of society" that they become public figures "for all purposes and in all contexts." *Id.* at 351-52. Limited-purpose public figures have "voluntarily inject[ed]" themselves or been "drawn into a particular public controversy," thereby becoming public figures "for a limited range of issues." *Id.* at 351. Typically, a limited-purpose public figure has "(1) successfully invited public attention to [her] views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected [herself] into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media." *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 136-37 (2d Cir. 1984). "Whether a plaintiff is a public figure is a question of law for the court." *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000).

17

Applying those criteria here, plaintiff is an all-purpose public figure. She made a living as a prominent model and actress long before the controversy involving the President arose, and her numerous appearances in modeling competitions, magazine features, films, television programs, and calendars is a matter of public record. *See, e.g.*, Joe Palazzolo et al., *National Enquirer Shielded Donald Trump From Playboy Model's Affair Allegation*, Wall St. J. (Nov. 4, 2016), https://on.wsj.com/2TolUjN (former Playboy centerfold model and 1998 Playmate of the Year); Karen McDougal, *Model, Columnist, Advocate, Spokesmodel,* karenmcdougal.com/about (last visited Feb. 14, 2020) (fitness model, television and film actress, modeling, sports radio personality, lifestyle columnist). The Court may take judicial notice of those materials at the motion to dismiss stage to determine plaintiff's status as an all-purpose public figure. *See, e.g.*, *Biro*, 963 F. Supp. 2d at 271 n.9.

But even if plaintiff were not an all-purpose figure, she would at least qualify as a limited-purpose public figure. At the time Carlson made the statements at issue, plaintiff was at the heart of a very public and extensively covered controversy over whether the President had committed a crime by allegedly directing his lawyer to pay her a hefty sum to keep her story quiet. Am. Compl. ¶¶8-9, 29-33; *see generally* Vid. During the prior months, plaintiff herself had thrown this controversy into the public spotlight. *See, e.g.*, Jim Rutenburg, *Ex-Playboy Model Karen McDougal Details 10-Month Affair With Donald Trump*, N.Y. Times (Mar. 22, 2018), https://nyti.ms/2T7SBBO. That controversy was the subject of the *Tucker Carlson Tonight* segment, which engaged with *New York Times* coverage of the issue and offered commentary critical of the theory that payments to an ex-lover could qualify as campaign donations. Because the allegedly defamatory statements were made about plaintiff in her role as a figure in that public controversy, they are subject to heightened protection.

18

To state a claim for defamation, then, plaintiff must allege facts showing that Carlson (and, by extension, Fox News) acted with actual malice—"a term of art denoting deliberate or reckless falsification." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 499 (1991). In other words, the facts alleged in the amended complaint must establish that Carlson knew his statements were false or that he acted with reckless disregard as to their falsity. *Biro*, 807 F.3d at 544-46. Actual malice may be inferred from context and circumstances, but the inference must be *plausible*, drawn from specific and objective facts. *Id.* (citing *Twombly* and *Iqbal*).

Plaintiff's amended complaint does not meet that demanding standard. Many of its allegations about actual malice are purely conclusory. *See* Am. Compl. ¶¶11, 14, 38, 45-46. And the two non-conclusory theories the amended complaint offers are not supported by facts that give rise to a plausible inference of actual malice.

The amended complaint's first theory is that Carlson acted with reckless disregard as to the falsity of his statements by failing to investigate whether they were true by speaking with plaintiff, the President, Cohen, or anyone else involved in facilitating the payment to plaintiff. *Id.* ¶¶35, 41-43. Had Carlson investigated, the amended complaint speculates, he would have discovered that no one involved ever accused plaintiff of extorting Trump. *Id.* ¶¶21-35.

That allegation is nowhere near sufficient to meet the high bar that actual malice sets. Indeed, the Supreme Court has squarely held that "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989); *see also, e.g.*, *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (recklessness "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing"). Rather, a plaintiff must state facts sufficient to "permit the conclusion that the defendant *in fact*

entertained serious doubts as to the truth of his publication," *id.* at 731 (emphasis added), or acted with a "high degree of awareness" of its "probable falsity," *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964).

The amended complaint nods that direction by speculating, in somewhat scattered fashion, that Carlson must have entertained serious doubts about the truth of his statements because Fox News (although not Carlson himself) had previously reported on the payment to plaintiff without stating that plaintiff had committed extortion. Am. Compl. ¶¶36, 41, 47. The amended complaint attempts to bolster that allegation by asserting that Carlson had a motive to distort the truth because he enjoyed a "personal relationship with Trump" and wished to "curry favor with him" by presenting him in a sympathetic light at a "politically vulnerable time." *Id.* ¶¶36, 48. It adds that Carlson's "close personal relationship" with Trump should also have made him aware that the payment to plaintiff was not the result of extortion. *Id.* ¶51.

Those allegations are again wholly insufficient to deprive defendant Fox News of First Amendment protection. At the outset, that theory ignores the problem that Carlson was not reporting facts. He was merely offering opinion on facts reported by others. Whether Fox News had reported those same facts in the past is therefore irrelevant. But even setting that aside, the amended complaint nowhere alleges that the earlier reporting by Fox News *contradicted* what Carlson said; it alleges only that the reporting was silent about extortion. The amended complaint thus fails to establish any inconsistency between the earlier reporting and Carlson's later commentary, particularly given the developing-news context in which both occurred.

At any rate, even taking Plaintiff's claim of contradiction at face value, it is squarely foreclosed by Supreme Court precedent. In *New York Times Co. v. Sullivan*, the plaintiff similarly contended that the *New York Times* must have known an item it published was false because the

20

newspaper had previously run articles stating the facts differently.  376 U.S. at 263, 287.  The Supreme Court rejected that argument, explaining that the "mere presence" of the earlier articles in the newspaper could not establish that the *Times* "knew" the later item was false, because the "state of mind required for actual malice" must be "brought home" to those at the *Times* who were actually responsible for publishing the later item—it had to be shown that *they themselves* knew about, and disregarded, the earlier articles.  *Id.* at 287.

The amended complaint here likewise fails to "bring home" the requisite state of mind to Carlson:  It makes no allegation that *Carlson himself* knew about Fox News' previous reporting when he made the allegedly defamatory statements at issue.  Nor does it offer any reason to conclude that Carlson must have known—by, for example, alleging facts to show that he exercised editorial control over the earlier Fox News reports.  *Cf. Palin v. N.Y. Times Co.*, 940 F.3d 804, 814 (2nd Cir. 2019) (complaint sufficiently alleged knowledge of earlier articles by publication's editor-in-chief, who had reviewed and overseen publication of earlier content).  Instead, the amended complaint skips from a vague reference to a previous report by *someone* on *some* Fox News program to the conclusion that Carlson "knew or should have known" that *his* statements on *his* program were false.  Am Compl. ¶47.  At most, the amended complaint alleges that Carlson was negligent in failing to familiarize himself with earlier reporting, but—again—"[m]ere negligence does not suffice" to show actual malice.  *Masson*, 501 U.S. at 510; *see also, e.g.*, *N.Y. Times*, 376 U.S. at 288 ("[T]he evidence against the Times supports at most a finding of negligence in failing to discover the misstatements, and is constitutionally insufficient to show the recklessness that is required for a finding of actual malice.").

Nor do the assertions about Carlson's "close personal relationship" with Trump push the amended complaint's allegations of actual malice into the realm of plausibility.  To begin with,

the claim that Carlson and Trump enjoyed a close personal relationship appears to rest on the flimsy basis that Trump "tweeted positively about Carlson" 47 times, including (on one occasion) to congratulate him on the success of his recent book. Am. Compl. ¶51. It should go without saying that one public figure's positive tweets about another, even if frequent, hardly demonstrate a "close personal relationship" between the two. There is thus no foundation for the amended complaint's conclusory assertion that Carlson was "more likely than the average person to know" that plaintiff "did not extort Trump." *Id.*

Moreover, even if the amended complaint alleged facts sufficient to support the claim that Carlson and Trump enjoyed a "close personal relationship," that would not remotely suffice to support the further claim that Carlson knowingly fabricated a story on national television to protect Trump. Mere allegations of personal or political motive or bias cannot, without more, establish actual malice. *Harte-Hanks Commc'ns*, 491 U.S. at 665 (A "newspaper's motive in publishing a story—whether to promote an opponent's candidacy or to increase its circulation—cannot provide a sufficient basis for finding actual malice."). As the Second Circuit recently held, a plaintiff must allege facts beyond "sheer political bias" to advance past the pleading stage; it must allege facts showing the defendant's personal hostility to the plaintiff, concrete political gain from making the allegedly false statement, and, of course, actual knowledge of the falsity of the statement. *See Palin*, 940 F.3d at 814 (actual malice adequately alleged where editor-in-chief reviewed and oversaw publication of previous accurate articles about plaintiff; harbored personal hostility toward her; and had a brother who stood to gain politically from publication of allegedly false statements about her).

The amended complaint alleges none of those things. Nor could it. As the *Tucker Carlson Tonight* segment itself demonstrates, not just Carlson but also his guests considered it a real

possibility that plaintiff had "extorted" payments from Trump.  Although the guest who did not

"like Trump" maintained that "actual extortion" had not been proven, he did not rule it out, and

the other guest thought the evidence weighed in favor of extortion.  Vid 6:03, 15:45.  Nothing in

either the segment itself or the facts alleged in the amended complaint comes close to suggesting

that Carlson deliberately or recklessly made false statements about plaintiff.  Because the amended

complaint fails to allege actual malice, plaintiff's suit cannot proceed.

## CONCLUSION

For the reasons set forth above, this Court should grant the motion to dismiss.

Respectfully submitted,

s/Shawn Patrick Regan

SHAWN PATRICK REGAN
HUNTON ANDREWS KURTH LLP
200 Park Avenue
New York, NY 10166
(212) 309-1046
sregan@hunton.com

ELBERT LIN*
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Ave., NW Suite 900
Washington, DC  20037
(202) 955-1548

ERIN E. MURPHY*
K. WINN ALLEN, P.C.*
KATHLEEN A. BROGAN*
ANDREW C. LAWRENCE*
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington, DC 20004
(202) 389-5000

EVELYN BLACKLOCK*
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 390-4547

* pro hac vice

*Counsel for Defendant Fox News Network, LLC*

February 14, 2020

23

**CERTIFICATE OF SERVICE**

The foregoing Memorandum in Support of Defendant's Motion to Dismiss was served

electronically on all counsel of record in this matter via the Court's ECF system.

<u>s/Shawn Patrick Regan</u>
Shawn Patrick Regan