UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X    No. 1:19-cv-11161-MKV

KAREN MCDOUGAL,

        Plaintiff,

        V.

FOX NEWS NETWORK, LLC

        Defendant,

------------------------------------------------------------X

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
## <u>MOTION FOR JUDGMENT ON THE PLEADINGS</u>

ERIC R. BERNSTEIN, P.C.
260 Madison Avenue 18th floor
New York, New York 10016
(212) 683-1530

*Attorneys for Plaintiff Karen McDougal*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... i

PRELIMINARY STATEMENT ............................................................................................... 2

LEGAL STANDARD................................................................................................................ 3

STATEMENT OF FACTS ........................................................................................................ 4

LEGAL ARGUMENTS............................................................................................................. 7

I.       The Alleged Statements Can Reasonably be Interpreted as
Reporting Facts ............................................................................................... 7

II.      The Complaint Alleges Actual Malice ........................................................... 11

CONCLUSION………………………………………………………………………………..17

## **TABLE OF AUTHORITIES**

### **CASES**

*Agbimson v. Handy,* 17-cv-9252(WHP), 2019 WL 3817207 (S.D.N.Y. Aug. 14, 2019) .............. 8

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ................................................................................................ 3

*Celle v. Filipino Reporter Enterprises,* 209 F.3d 163 (2d Cir. 2000) ............................................. 10

*Elias v. Rolling Stone LLC,* 872 F.3d 97 (2d Cir. 2017) .................................................................... 9

*Friedman v. Bloomberg, L.P.,* 884 F.3d 83 (2d Cir. 2018) ......................................................... 9, 10

*Grande v. Gristede's Food's, Inc.,* 11-civ-777(SAS), 2011 WL 4716339
(S.D.N.Y. Oct. 7, 2011) ................................................................................................................ 10

*Karedes v. Ackerly Grp., Inc.,* 423 F.3d 107 (2d Cir. 2005) .............................................................. 8

*Kramer v. Time Warner Inc.,* 937 F.2d 767 (2d Cir. 1991) .............................................................. 3

*Oakley v. Dolan,* 17-cv-6903(RJS), 2020 WL 818920 (S.D.N.Y. Feb. 19, 2020) .......................... 4

*Palin v. New York Times,* 940 F.3d 804 (2d Cir. 2019) ........................................................ *passim*

*Wexler v. Allegion (UK) Ltd.,* 374 F.Supp.2d 302 (S.D.N.Y. 2019) ................................................ 8

### **STATUTES**

Fed. R. Civ. P. 8 .................................................................................................................................... 2

Fed. R. Evid. 201 ................................................................................................................................. 3

Rule 12(b)(6) ............................................................................................................................ 4, 10, 13

**PRELIMINARY STATEMENT**

Defendant neither cited to nor referenced *Palin v. New York Times,* 940 F.3d 804 (2d Cir. 2019), the most recent and instructive Second Circuit decision relevant to this case. The Second Circuit in *Palin* examined the pleading requirements for malice necessary to sustain a defamation action by a public figure against a media outlet. As set forth more fully below, the *Palin* court held that plausible allegations of falsity and malice sufficed to state a defamation claim under Fed. R. Civ. P. 8 (federal notice pleading requirements).

We respectfully submit that plaintiff met her burden under Fed. R. Civ. P. 8. The amended complaint ("complaint") plausibly alleged that Tucker Carlson intentionally and falsely reported to an international audience that plaintiff committed a crime. The complaint further alleged that Carlson was motivated to make such statement because he was biased in favor of President Trump. Furthermore, we allege Carlson wanted to spread misinformation at a time when Congress considered impeaching the President over hush-money payments made to plaintiff and whether the President could be indicted for campaign finance violations.

Defendant now seeks to dismiss the complaint arguing that Carlson's statements were merely "opinion," not "sober factual reporting," and "not as actual statement of facts." *See,* Defendant's Brief at 1-2. Defendant's argument, however, is belied by the allegations in the complaint and the exhibits that defendant submitted to the court. The complaint and video reveal that Carlson said that it was "fact", indeed "undisputed fact," that plaintiff extorted Trump. *See,* Complaint at ¶¶8-12. Defendant should not be allowed to rewrite history and argue that what Carlson claim was fact in December 2018 is hyperbole and opinion in February 2020.

Defendant also argues that the complaint fails to allege actual malice or that Carlson made the statements knowing they were false or with reckless disregard as to their falsity. A review of the complaint proves that malice was plausibly alleged. Among other things, defendant previously reported about the payment to plaintiff and never asserted that it was a result of extortion (*Id.* at ¶36). Everyone involved in the payment to plaintiff, including Trump, never said it was the result of extortion (*Id.* at ¶¶22-34). Finally, Carlson knowingly and falsely accused plaintiff of extortion because of his personal relationship with Trump and to curry favor with him at a time when Trump was politically vulnerable (*Id.* at ¶¶45-47).

In the end, there is not a shred of evidence from any source that plaintiff approached Trump. There is also not a shred of evidence that plaintiff threatened and extorted Trump. Carlson made this up out of whole cloth with malice and reckless disregard for the truth. Accordingly, based upon the complaint and the recent holding in *Palin v. New York Times*, we respectfully submit that plaintiff stated a claim against defendant as a matter of law.

## **LEGAL STANDARD**

For a 12(b)(6) motion, the Court "must construe the complaint liberally, accepting all factual allegations as true, and drawing all reasonable inferences in the plaintiff's favor." *Palin v. New York Times*, 940 F.3d 804 (2d Cir. 2019). Once the facts are construed in the light most favorable to the plaintiff, to avoid dismissal, there must be sufficient facts that allege a plausible claim. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "[A] district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference. Of course, it may also consider matters of which judicial notice may be taken under Fed. R. Evid. 201." *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir. 1991).

## STATEMENT OF FACTS[1]

Carlson hosts a news program called "Tucker Carlson Tonight." *Id.* at ¶5. On December 10, 2018, defendant broadcasted Carlson's show. *Id.* at ¶7. His show was about, *inter alia,* payments made to plaintiff. *Id.* at ¶7. Carlson began his reporting on these payments as follows: "Remember the facts of the story, these are undisputed. Two women [one of which was plaintiff] approached Donald Trump and threatened to ruin his career and humiliate his family if he doesn't give them money." *Id.* at ¶10.[2] Carlson said this was "a classic case of extortion" and that Michael Cohen made the "extortion payments" on behalf of Trump. *Id.* at ¶¶16, 20.[3] Of course, that did not happen, and Carlson knew that it never happened at the time he made these statements to an audience of more than 3,000,000 people. *Id.* at ¶4.

Here is what happened: David Pecker ("Pecker") is the Chairman and C.E.O. of America Media, Inc. ("AMI").  Pecker, in coordination with Trump and his lawyer Michael Cohen ("Cohen"), orchestrated a "catch and kill" campaign to purchase stories that could negatively affect Trump during his campaign for President.  As a result, they paid-hush money to women

---

[1] Defendant's statement of facts includes material that is either irrelevant or *de hors* the record on a Rule 12(b)(6) motion.  For example, defendant cites to Carlson's website, biographical information, comedian Kevin Hart, Maxine Waters, Russia Probe, and other segments of his show that are not at issue here "in light of the broader context." Defendant's Brief at 3-4, 19. As a general matter, taking judicial notice of material not referenced in the complaint is impermissible when deciding a motion to dismiss the pleading. *Oakley v. Dolan,* 17-cv-6903(RJS), 2020 WL 818920, *6 (S.D.N.Y. Feb. 19, 2020).

[2] Although Carlson never mentioned plaintiff by name, he put a picture of her on the screen while reporting that she extorted Trump. *Id.* at ¶13.

[3] Extortion is a felony under both federal and state law. *Id.* at ¶¶18-19. Accordingly, special damages need not be alleged. *Oakley v. Dolan,* 17-cv-6903(RJS), 2020 WL 818920, *10 (S.D.N.Y. Feb. 19, 2020)(defamation *per se* may be plead in lieu of special damages if the defamatory statement accuses plaintiff "with a serious crime."

that Trump had extramarital affairs with including plaintiff. In fact, in August 2015, Pecker met Trump and Cohen to discuss this plan. The following month, on June 27, 2016, Trump phoned Pecker about plaintiff and asked: "Can you make this go away?" AMI then negotiated with plaintiff to purchase her story on August 5, 2016 and prevent its publication for $150,000. Within several weeks, Cohen and Pecker agreed that AMI would assign plaintiff's story to one of Cohen's limited liability companies. At no time did Cohen, Pecker, AMI or Trump ever accuse plaintiff of extorting anyone. *Id.* at ¶¶22-28.

Indeed, Cohen, AMI, and Pecker all agreed and admitted to federal prosecutors that Trump directed Cohen to pay plaintiff $150,000 because he "was very concerned about how this would affect the election." The payment to plaintiff had nothing to do with extortion and Carlson always knew that. Even Trump, the alleged victim of the extortion plot according to Carlson, never said that he was extorted. In January 2018, Trump denied any involvement in the payments to plaintiff; in August 2018 Trump stated that he only found out about the payment after the fact but it was legal to do so; and in December 2018 he stated that plaintiff was paid on the advice of Cohen, that he never directed Cohen to break the law, and that if anything illegal happened it was Cohen's fault. *Id.* at ¶¶29-34.

Notwithstanding that everyone involved in the payment to plaintiff never accused her or even mentioned extortion or the fact that defendant previously reported on the payment and, like everyone else, never mentioned or accused plaintiff of extortion, Carlson said: "Remember the facts of the story, these are undisputed. Two women [one of which was plaintiff] approached Donald Trump and threatened to ruin his career and humiliate his family if he doesn't give them

money." *Id.* at ¶¶10, 21, 36. Carlson fabricated the story about plaintiff and accused her of committing a crime because he was motivated by malice.

Carlson's malice towards the plaintiff was motivated by his friendship and political support for Trump at a time when Trump's presidency was politically vulnerable. Carlson had a pre-determined narrative that he wanted to report as fact despite knowing it was false because he wanted to help Trump. *Id.* at ¶¶45-46.

On December 9, 2018, Sunday political television programs discussed the possibility that Trump could be impeached and/or indicted because the payment to plaintiff was a violation of the federal election laws. On December 10, 2018, in the morning, CNN, ABC, and the Washington Post reported that White House sources stated that Trump was worried that the payments to plaintiff may be the cause of his impeachment once the Democratic controlled House of Representatives takes over in January. Later that night, Carlson dedicated 15 minutes out of a 41-minute program to address these payments calling them extortion (13 times) to cover for Trump and intentionally lie to the public about plaintiff. *Id.* at ¶¶47-48. Carlson and Trump also had a close personal relationship. Trump tweeted positively about him no less than 47 times. Indeed, in support of Carlson's book release, on October 13, 2018, one of those tweets read "Congratulations to Tucker Carlson on the great success of his book, 'Ship of Fools.' It just went to NUMBER ONE!" *Id.* at ¶49.

The complaint further alleges, plausibly, that Carlson's statements were made with reckless disregard for the truth. Carlson could not have come to the conclusion that plaintiff extorted Trump had he conducted even a cursory amount of research or viewed prior news coverage by the defendant. All he had to do was speak with Trump, Cohen, plaintiff, Pecker, or

anyone else at AMI to find out the truth. Carlson could have easily verified that plaintiff did not approach Trump and threaten to ruin his career and humiliate his family if he did not give her money. Carlson recklessly failed to speak or investigate what he was reporting because he had a pre-determined narrative. He was reporting that plaintiff unlawfully extorted Trump regardless of what the facts were. *Id.* at ¶¶35-45.

## LEGAL ARGUMENTS

### I. The Alleged Statements Can Reasonably be Interpreted as Reporting Facts

Defendant argues that Carlson's statements cannot "reasonably be interpreted as stating actual facts concerning plaintiff …" *See,* Defendant's Brief at 10-11. Rather, defendant claims that an objective viewer would hear Carlson's words only as "loose, figurative, or hyperbolic" or "imaginative expression." *Id.* at 11. We respectfully disagree and believe that the court cannot make such a finding on a motion to dismiss. In fact, Carlson's own words defeat his argument that his "dialogue was taking place on a animated, not-literal plane." *Id.* at 16.

Carlson did not begin his show informing his viewership that they were about to hear his opinion or that this was what he subjectively believed. Instead, he began the show with: "Remember the facts of the story, these are undisputed." *See,* Complaint at ¶10. A rationale viewer would believe that what Carlson is about to say is undisputed facts, not hyperbole or imagination as defendant now suggests.

Following up on his undisputed facts preamble, Carlson states that "[t]wo women [one of which was plaintiff and later shows a picture of her] approached Donald Trump and threatened

to ruin his career and humiliate his family if he doesn't give them money." *Id.*[4] This is an easily discernible fact to prove true or false. Did plaintiff approach Trump and threaten his career and humiliate his family unless he gives her money? There is nothing loose or figurative about this statement. Carlson literally told his viewers that it was undisputed fact that plaintiff extorted Trump. Indeed, Carlson told his viewers that this is "a classic case of extortion" (which it would be if it was true) and that Cohen made the "extortion payments" on behalf of Trump. *Id.* at ¶¶16, 20. (*Compare,* "Carlson was not 'stating actual facts' about extortion" (Defendant's Brief at 17) with Carlson's preamble "Remember the facts of the story, these are undisputed." (Complaint at ¶10.)

The court, in the first instance, must decide whether the statement at issue are reasonable susceptible to a defamatory meaning. *Wexler v. Allegion (UK) Ltd.,* 374 F.Supp.2d 302, 310 (S.D.N.Y. 2019). "[A] defamatory statement [is] one that exposes an individual to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or induces an evil opinion of one in the minds of right-thinking persons, and deprives one of confidence and friendly intercourse in society." *Karedes v. Ackerly Grp., Inc.,* 423 F.3d 107, 113 (2d Cir. 2005).

Defendant argues that calling plaintiff an extortionist and describing the manner in which she committed such a crime (approaching "Donald Trump and threatened to ruin his career and humiliate his family if he doesn't give [her] money") is not a factual statement. Defendant argues,

---

[4] "Importantly, a plaintiff need not be specifically named in a publication to sustain a cause of action, but rather must sustain the burden of … proving that the defamatory statement referred to him. The dispositive inquiry is whether a reasonable listener or reader could have concluded that the statements were conveying facts about the plaintiff." *Agbimson v. Handy,* 17-cv-9252(WHP), 2019 WL 3817207, *5 (S.D.N.Y. Aug. 14, 2019)(citations omitted).

in the alternative, that even if calling someone an extortionist is a factual statement, it was merely hyperbolic because being called an extortionist may be interpreted in different ways by different people. We respectfully submit that defendant's arguments fail for two reasons.

First, Carlson's statement referring to plaintiff as an extortionist was a statement of fact. He described the manner, motive, and method in which plaintiff purportedly extorted Trump. In considering whether a statement is one of fact versus opinion, the court must consider "(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the ... surrounding circumstances are such as to signal [to] ... readers or listeners that what is being read or heard is likely to be an opinion, and not fact." *Elias v. Rolling Stone LLC,* 872 F.3d 97, 110 (2d Cir. 2017).

Here, the specific language has a precise meaning which is readily understandable – plaintiff approached Trump and threatened to ruin his career and humiliate his family if he doesn't give her money. There is nothing ambiguous about that statement. Such a statement is certainly capable of being true and false and, as set forth in the complaint, was repeatedly proven false. *See, Friedman v. Bloomberg, L.P.,* 884 F.3d 83, 97 (2d Cir. 2018)(a claim of extortion "is reasonably susceptible to a defamatory meaning ... [and] a statement that is capable of being proven false.")[5] Finally, the full context of the communication and surrounding circumstances of the statement signaled to the listeners that it was fact not opinion – Carlson specifically said

---

[5] Even if a reasonable viewer would interpret that word "extort" as hyperbolic language this statement would still be actionable because it implies that "the speaker knows certain facts, unknown to his audience, which support his opinion and are detrimental to the person about whom he is speaking." *Friedman v. Bloomberg, L.P.,* 884 F.3d 83, 97 (2d Cir. 2018)(citations omitted).

{N0119672.1}    9

"Remember the facts of the story, these are undisputed." Carlson's statements about plaintiff were made to his viewers with a straightforward and declaratory voice. Carlson did not parse words when it came to his statements against the plaintiff. Moreover, "the words [of a defamatory statement] are to be construed not with the close precision expected from lawyers and judges but as they would be read and understood by the public to which they are addressed." *Celle v. Filipino Reporter Enterprises,* 209 F.3d 163, 178 (2d Cir. 2000).

Second, calling someone an extortionist is not hyperbolic expression as a matter of law as defendant suggests while citing to non-binding authority for support. For example, in *Friedman v. Bloomberg, L.P.,* 884 F.3d 83 (2d Cir. 2018) the district court dismissed plaintiff's defamation claim on the pleading. Plaintiff alleged that defendant defamed him by stating that plaintiff "has repeatedly tried to extort money from the company." *Id.* at 94. The Second Circuit reversed holding that this statement was susceptible to a defamatory meaning (that the plaintiff engaged in criminal conduct) and implies the existence of undisclosed facts that were detrimental to plaintiff's character. *Id.* The Second Circuit explained that "… a reasonable reader could interpret [defendant's] use of the word 'extort' here as more than just 'rhetorical hyperbole' …" *Id.* at 97. The Second Circuit concluded that "[o]n remand, it will be up to the jury to decide both (1) whether readers understood [defendant's] statement [about extortion] to mean that [plaintiff] engaged in criminal conduct and (2) whether the statement in fact defamed [plaintiff]." *Id.* at 98.

Similarly, in *Grande v. Gristede's Food's, Inc.,* 11-civ-777(SAS), 2011 WL 4716339, *3 (S.D.N.Y. Oct. 7, 2011), plaintiff commenced a defamation action against his former employer who publicly accused him of "attempted extortion." Defendant moved to dismiss the complaint under Rule 12(b)(6). The district court denied the motion holding, *inter alia,* that "[a] reasonable

juror could find that such a statement was one of fact, not opinion." The same should hold true here.

Accordingly, for the reasons set forth above, we respectfully submit that the defamatory statements alleged in the complaint are plausibly capable of being interpreted as fact to a reasonable listener and not opinion or hyperbole.

### II. The Complaint Alleges Actual Malice

Defendant argues that plaintiff failed to allege actual malice. In particular, defendant claims that the complaint failed to allege that Carlson's statements were made "with knowledge that the statements were false or with reckless disregard as to their falsity." *See,* Defendant Brief at 21, 23. Defendant further argues that "[m]ost of [plaintiff's] allegations about malice are purely conclusory." *Id.* at 24. We respectfully disagree and submit that the complaint plausibly alleged that Carlson was motivated by his personal relationship with Trump and that he intentionally disregarded his own network's reporting regarding how and why payments were made to plaintiff.

The complaint alleged that Carlson had a personal friendship with Trump and politically supported him. During the first week of December 2018, Trump was politically vulnerable because major news outlets were reporting that Trump could be indicted or impeached for paying hush money to plaintiff in violation of federal law. As a result, Carlson took the airwaves with a pre-determined narrative – that plaintiff "approached Donald Trump and threatened to ruin his career and humiliate his family if he doesn't give them money." *Id.* at ¶¶10, 45-49. Carlson made these statements knowing they were false or should have reasonable known that they were false. For example, his own network previously reported on these payments and never

once referred to them as extortion. Moreover, all of the people involved in making the payments except Trump previously stated that the principle purpose for the transaction was to suppress plaintiff's story because Trump "was very concerned about how this would affect the election." *Id.* at ¶¶25-45.[6] At no time did any person or news outlet report that plaintiff extorted Trump. This is where *Palin v. New York Times,* 940 F.3d 804 (2d Cir. 2019) is most instructive; where the Second Circuit discussed "rules of procedure and pleading standards" in defamation actions. *Id.* at 808.

In *Palin,* the editorial board at the New York Times published an article entitled "America's Lethal Politics" ("the editorial") in response to a political shooting. The editorial linked Sarah Palin's political action committee ("PAC") to political incitement and noted that Palin's PAC had a map of targeted electoral districts that put Democrats under stylized cross hairs suggesting that the congress members themselves had been pictured on the map. *Id.*

"The Times faced an immediate backlash for publishing the editorial. Within a day, it had changed the editorial and issued a correction. The Times removed the two phrases suggesting a link between Palin and the [] shooting. Added to the editorial was a correction that read: 'An earlier version of this editorial incorrectly stated that a link existed between political incitement and the 2011 shooting of Representative Gabby Giffords. In fact, no such link was established.' The Times also clarified that the SarahPAC map had overlaid crosshairs on Democratic congressional districts, not the representatives themselves." *Id.* at 808-809.

---

[6] Trump story with respect to the payments was a moving target. In January 2018, Trump denied any involvement; in August 2018 Trump stated that he only found out about the payment after the fact; and in December 2018 he stated that plaintiff was paid on the advice of Cohen.

"Twelve days after the editorial was published Palin sued the Times in federal court. She alleged one count of defamation under New York law. Thereafter, the Times moved to dismiss Palin's complaint for failure to state a claim." *Id.* at 809. After the motion was fully brief, the district court judge held a hearing to assess "the plausibility of the '[o]ne close question' presented by the Times' motion to dismiss: whether Palin had sufficiently pled the actual malice element of her defamation claim." *Id.* James Bennett, the author of the editorial, was the sole witness at the hearing. *Id.* The district court, relying on evidence adduced at the hearing, granted the Times' motion to dismiss under Rule 12(b)(6). *Id.*

"When actual malice in making a defamatory statement is at issue, the critical question is the state of mind of those responsible for the publication. Because the Times identified Bennet as the author of the editorial, it was his state of mind that was relevant to the actual malice determination." *Id.* As a result, the Second Circuit reviewed Palin's proposed amended complaint "to determine whether she stated a plausible claim for defamation." *Id.* at 813.

The Second Circuit found that Palin's complaint had an "overarching theory of actual malice" by alleging that Bennet had a "pre-determined" argument he wanted to make in the editorial. *Id.* "Bennet's fixation on this set goal, the claim goes, led him to publish a statement about Palin that he either knew to be false, or at least was reckless as to whether it was false." *Id.* The Second Circuit found three reasons why the allegations in Palin's complaint "paint a plausible picture" of actual malice. *Id.*

First, the complaint sufficiently alleged that Bennet knew before publishing the editorial that it was false because of previous positions he had held reviewing articles stating that Palin's PAC had nothing to do with the shooting. *Id.* at 813-814. The complaint further alleged that

Bennet had personal reasons to be politically biased towards Palin. "At a minimum, these allegations give rise to a plausible inference that Bennet was recklessly disregarding the truth when he published the editorial without reacquainting himself with the contrary articles published in *The Atlantic* six years earlier. And that plausible inference of reckless disregard is strengthened when added to Palin's allegations that Bennet had reason to be personally biased against Palin and pro-gun positions in general. When properly viewed in the plaintiff's favor, a reasonable factfinder could conclude this amounted to more than a mistake due to a research failure." *Id.* at 814-815.

Second, Palin's complaint alleged that Elizabeth Williamson, "the editorial writer who drafted the initial version of the editorial, had hyperlinked in her draft an article ... [that] stated, contrary to the claim in the published editorial, that '[n]o connection' was made between the SarahPAC map and [the shooting]. The link was also included in the final version of the editorial, a version that Bennet essentially rewrote. The Times argue[d] that the hyperlink show[ed] the absence of malice. But [Palin's complaint] allege[d] that, by including a hyperlink that contradicted the argument of his editorial, Bennet 'willfully disregarded the truth.'" *Id.* The Second Circuit found that both inferences about the hyperlink were plausible and therefore "any inference to be drawn from the inclusion of the hyperlinked article was for the jury—not the court." *Id.*

"Third, the district court concluded that the correction swiftly issued by the Times again demonstrated that the only plausible explanation for the erroneous statements was a mistake. Yet, it is also plausible that the correction was issued after a calculus that standing by the editorial was not worth the cost of the public backlash. Bennet could have published the editorial

knowing—or recklessly disregarding—the falsity of the claim, and then decided later that the false allegation was not worth defending." *Id.*

The Second Circuit reversed the district court and held "[t]herefore, at the pleading stage, we are satisfied that Palin has met her burden to plead facts giving rise to the plausible inference that Bennet published the allegedly defamatory editorial with actual malice. We emphasize that actual malice does not mean maliciousness or ill will; it simply means the statement was 'made with knowledge that it was false or with reckless disregard of whether it was false or not.' Here, given the facts alleged, the assertion that Bennet knew the statement was false, or acted with reckless disregard as to whether the statement was false, is plausible." *Id.* at 15-16.

The Second Circuit concluded "by recognizing that First Amendment protections are essential to provide 'breathing space' for freedom of expression. But, at this stage, our concern is with how district courts evaluate pleadings. Nothing in this opinion should therefore be construed to cast doubt on the First Amendment's crucial constitutional protections. Indeed, this protection is precisely why Palin's evidentiary burden at trial—to show by clear and convincing evidence that Bennet acted with actual malice—is high. At the pleading stage, however, Palin's only obstacle is the plausibility standard of *Twombly* and *Iqbal*. She has cleared that hurdle." *Id.* at 816-817.

Here, the allegations against Carlson at Fox News is similar to the allegations against Bennet at the Times. For example, it is alleged that Carlson said on December 10, 2018 that plaintiff approached Trump and threatened to ruin his career and humiliate his family if he did not give her money. Carlson made these statements knowing that Fox News had previously reported on the topic and never claimed that plaintiff extorted Trump. Carlson made these

statements also knowing that neither Trump, Cohen, Pecker, nor anyone else at AMI made such accusations against plaintiff and that AMI, Pecker and Cohen had previously admitted that these payments were made to aid Trump in his campaign for president. *See,* Complaint at ¶¶36, 45.

The complaint further alleges that Carlson knowingly made these false statements in furtherance of his personal relationship with Trump (no less than 47 public positive tweets in favor of Carlson by Trump) and to curry favor with him at a time when Trump thought that he would be impeached because the payment to plaintiff was being described as a violation of the federal election laws. *See,* Complaint at ¶¶36, 39, 46-49.

Finally, the complaint alleges, like in *Palin,* that Carlson had a pre-determined narrative that he wanted to report as fact despite knowing it was false. Carlson's fixation on this goal caused him to assert "facts" about plaintiff that he knew were not true. *See,* Complaint at ¶¶45-48.

Here, as in *Palin,* we respectfully submit that plaintiff plausibly alleged malice. She alleged with specificity that, *inter alia,* Carlson knew that his reporting was false based upon defendant's previous reporting on the matter and publicly available evidence to the contrary. She also plausibly alleged that Carlson had personal reasons to be politically biased towards Trump at a time when Trump was politically vulnerable. She also alleged that Trump and Carlson had a close personal relationship based upon Trump's 47 tweets in favor of Carlson. The cumulative effect caused Carlson to knowing and intentionally malign plaintiff and accuse her of a crime to support Trump in his personal and political endeavors.

For the aforementioned reasons, defendant's motion to dismiss the complaint should be denied in its entirety.

## **CONCLUSION**

For the reason set forth above, this Court should deny the motion in its entirety.

Respectfully submitted,

Dated: New York, New York
February 24, 2020

*[signature]*

ERIC R. BERNSTEIN, P.C.
260 Madison Avenue 18th floor
New York, New York 10016
(212) 683-1530
ebernstein@nylegaljustice.com